Alberto LOPEZ, Jr.,
Petitioner–Appellee,

v.

O.L. McCOTTER,
Respondent–Appellant.

No. 88–2185.

United States Court of Appeals,
Tenth Circuit.

May 17, 1989.

Charles H. Rennick, Asst. Atty. Gen. (Hal Stratton, Atty. Gen., and Gail Mac-Questen, Asst. Atty. Gen., on the brief), Santa Fe, N.M., for respondent-appellant.

Edward L. Hand of John F. Schaber, P.A., Deming, N.M., for petitioner-appellee.

Before LOGAN, SETH and ANDERSON, Circuit Judges.

SETH, Circuit Judge.

The Secretary of Corrections for the State of New Mexico, the respondent, appeals the district court's order granting petitioner Alberto Lopez's petition for writ of habeas corpus. Because Mr. Lopez was entitled to have the jury consider his defense of bail bondsman's privilege with respect to the charges against him for attempted aggravated burglary and aggravated assault on Antonio Ojinaga, we affirm the district court's grant of habeas corpus with respect to those charges. We reverse the district court's grant of habeas corpus insofar as it concerns Mr. Lopez's conviction for aggravated assault on Deputy Sheriff Henderson because the bail bondsman's privilege cannot serve as a defense to the offense of aggravated assault upon a peace officer.

Though the parties vigorously dispute the particulars of the events which gave rise to the incidents herein concerned, the basic outline of what happened is not in doubt. *See generally State v. Lopez,* 105 N.M. 538, 540–41, 734 P.2d 778, 780–81 (Ct.App.), *cert. quashed,* 105 N.M. 521, 734 P.2d 761. A bail bond company operated by Mr. Lopez, the petitioner, posted a bond to secure the release of Rudy Ojinaga, who had been arrested in El Paso, Texas for possession of marijuana and for driving while intoxicated. Because Mr. Ojinaga failed to satisfy the conditions of his release on bond, Mr. Lopez determined to retake him and commenced proceedings in El Paso County Court aimed at surrender-

ing Mr. Ojinaga to the authorities in exchange for relief from the bond. The court issued a bench warrant for Mr. Ojinaga's arrest, directed to Texas peace officers, but this was not of particular significance as things turned out.

Mr. Lopez also sent an employee, George Sandoval, to Mr. Ojinaga's home in Central, New Mexico to physically retake Mr. Ojinaga. Mr. Sandoval went to the house of Mr. Ojinaga's parents in Central and told them of his purpose. The Ojinagas in turn telephoned a friend, Capt. Daniel Garcia, a Grant County undersheriff. When Capt. Garcia arrived, Mr. Sandoval informed him that he was a "bounty hunter" from El Paso, that he was seeking custody of Rudy Ojinaga, and he showed Capt. Garcia the Texas bench warrant for Rudy Ojinaga's arrest. Capt. Garcia asked Mr. Sandoval to return the following Tuesday, when Capt. Garcia would assist with Mr. Ojinaga's arrest if the district attorney's office determined that the Texas bench warrant was valid for that purpose. Mr. Sandoval returned to El Paso.

Things went awry a day or so later when Mr. Lopez and four of his men arrived at the Ojinaga house in Central. Mr. Lopez armed his men and had them surround the Ojinaga residence. Rudy Ojinaga's father, Antonio, answered the door when Mr. Lopez knocked. Mr. Lopez told him that he and his men intended to take custody of Rudy Ojinaga, by force if necessary. Antonio Ojinaga shut and locked the door; his wife phoned Capt. Garcia. At Mr. Lopez's direction, one of his men kicked in the door to the Ojinaga residence. Antonio Ojinaga brandished a knife. One of the bounty hunters pointed a shotgun or rifle at him, and told him to drop the knife. Observing other people inside, Mr. Lopez ordered his men not to enter the house.

With the bounty hunters and the Ojinagas at a standoff, Capt. Garcia arrived in an unmarked car. Mr. Lopez disarmed him. Capt. Garcia was in plain clothes but claimed at trial that a badge was pinned to his sport coat. Mr. Lopez denied seeing a badge. After Mr. Sandoval informed Mr. Lopez that Capt. Garcia was a peace officer, Mr. Lopez allowed Capt. Garcia to enter the Ojinaga house to retrieve Rudy Ojinaga and hand him over to the bounty hunters. Capt. Garcia instead called for support. Deputy Carl Henderson arrived first, but after an armed standoff, during which he stated his authority, he withdrew. When state policemen arrived, Lopez and his men surrendered.

Charges were filed against Mr. Lopez for aggravated assault on Capt. Garcia and Deputy Henderson, battery on Capt. Garcia, attempted aggravated burglary, and aggravated assault on Antonio Ojinaga. From the outset, Mr. Lopez relied on the common-law bail bondsman's privilege as his principal defense, arguing that his conduct was authorized by law and by private contract. Mr. Lopez twice moved for dismissal of the charges on this basis before trial. The trial court allowed Mr. Lopez to introduce evidence concerning the traditionally broad authority enjoyed by bondsmen and the procedures they customarily follow, including testimony by an El Paso County Attorney. However, the court denied Mr. Lopez's requested instructions on the bondsman's privilege to rearrest his principal, though the court did define "bail bond" for the jury. Twice during deliberations the jury requested instructions on the bail bondsman's privilege under the common law, and in particular whether a bail bondsman must have a "legal warrant in [his] possession to make an arrest." In both instances the trial court refused to instruct the jury. The jury ultimately found Mr. Lopez guilty of aggravated assault upon a peace officer for his actions toward Deputy Henderson, and of aggravated assault upon Antonio Ojinaga, of attempted burglary of the Ojinaga home, and of committing these crimes with the use of a firearm.

The trial court entered judgment against Mr. Lopez and the New Mexico Court of Appeals affirmed the convictions. The New Mexico courts construed the Uniform Criminal Extradition Act (UCEA), N.M. Stat.Ann. § 31–4–1 (Repl.Pamp.1984), enacted in 1937, to apply to the acts of petitioner. Thus the holding in substance was that the common-law authority of bonds-

men had been eliminated as to these circumstances and extradition was required. The holding also included a conclusion that N.M.Stat.Ann. § 31–3–4(B) (Repl.Pamp. 1984) which provided that bondsmen could arrest the principal and deliver him to the sheriff was not applicable by reason of the requirement that extradition be sought in these circumstances under the Uniform Act.

Mr. Lopez petitioned the United States District Court for habeas corpus relief. The magistrate to whom the matter was referred found that the trial court's erroneous refusal to recognize the bail bondsman's common-law arrest powers "denied Petitioner the opportunity to present possibly his strongest defense," and recommended that the petition be granted. The district court adopted the magistrate's findings and recommendation.

The state courts used the following section of the Uniform Act in reaching their conclusions that in substance the common law as to bondsmen had been eliminated as had the applicability of § 31–3–4(B) under these circumstances:

"31–4–14. Arrest without a warrant.

"The arrest of a person may be lawfully made also by any peace officer or a private person without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section [31–4–13 NMSA 1978]; and thereafter his answer shall be heard as if he had been arrested on a warrant."

The Act provides this important provision in permissive terms that "any credible person" may petition a magistrate or judge for an arrest warrant for the apprehension of an individual alleged to have violated the terms of his bail. *Id.* § 31–4–13.

At the time the incidents took place and now the New Mexico statute at N.M.Stat. Ann. § 31–3–4(B) relating to bail bondsmen, but not limited to New Mexico bondsmen, provides:

"When a paid surety desires to be discharged from the obligation of its bond, it may arrest the accused and deliver him to the sheriff of the county in which the action against the accused is pending."

Under this provision, upon surrendering the accused to the sheriff, the surety is required to deliver to the sheriff a copy of the order admitting the accused to bail and a certified copy of the bail bond. *Id.* § 31–3–4(C). The statute is not limited by its terms to sheriffs in New Mexico.

In an application of *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 and *Devine v. New Mexico Department of Corrections,* 866 F.2d 339 (10th Cir.), we conclude that the wording of the pertinent provisions of the Uniform Criminal Extradition Act was not so vague so as to give a "potential defendant" some notice by the vagueness that a question may arise, and perhaps it would be held to cover the "contemplated conduct." Instead the provisions are narrow and the coverage, in view of the particular statute as to bondsmen and the common law, gave no adequate notice to petitioner of the state court's construction.

Our inquiry in this case is *not* into what the law of New Mexico now is with respect to the recapture by a foreign bail bondsman of his principal in New Mexico. The New Mexico courts have spoken to this issue: henceforth, a foreign bondsman must comply with the UCEA in seeking the rearrest of his principal. *State v. Lopez,* 105 N.M. 538, 542–43, 734 P.2d 778, 782–83 (Ct.App.), *cert. quashed,* 105 N.M. 521, 734 P.2d 761. We must however determine whether the statutory construction announced in *State v. Lopez* was "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue" as the phrase is used in *Bouie* so that it should not be applied retroactively. *See Bouie,* 378 U.S. at 354, 84 S.Ct. at 1703.

*Bouie* concerned individuals convicted of criminal trespass because they remained in

6

the dining area of a drugstore after they had been asked to leave. The individuals were black, and were asked to leave solely because the drugstore refused to serve blacks in its dining area. The Supreme Court held that the state supreme court, in affirming the convictions, had construed the trespassing statute in an unforeseeable way that deprived the defendants of a fair warning that the acts for which they stood convicted were criminal at the time they committed them, thus violating the due process clause. The Court in *Bouie* distinguished other cases in which uncertainty as to a statute's prohibition resulted from vague or overbroad language in the statute itself, rendering the statute void for vagueness, and stated:

> "When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction."

The Court concluded that a judicial construction of a criminal statute must not be given retroactive effect if that construction is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue." *Id.* at 354, 84 S.Ct. at 1703 (quoting Hall, *General Principles of Criminal Law* (2d ed. 1960) at 58–59).

As we recently said in *Devine*, applying the *Bouie* rule to actual cases is complicated by the paucity of authority illustrating what constitutes an unforeseeable judicial construction of a criminal statute such that it should not be given retroactive effect. We there determined that, "if a criminal statute is 'narrow and precise' on its face, any judicial expansion of that statute beyond its own terms will be considered unforeseeable." Also, that the legal authority upon which the court construing the statute relies must also be reasonably accessible in light of the penalty imposed under the construction of the statute. We concluded in *Devine:*

> "Even if its decision were fully supported by rules of statutory interpretation, we cannot agree that a state court may employ relatively obscure legal techniques to add twenty years of prison time to the minimum penalty set down in every widely disseminated and published official source of law. Allowing such an action would sap the 'fair warning' requirement of all substance."

The consideration of the statutes and the state court's construction of the Uniform Act must be made as above, but also in the context of the common law as it then pertained generally and in New Mexico, this to follow *Bouie* and *Devine*. In New Mexico, criminal cases are governed by the common law "as recognized by the United States and the several states of the Union," unless a statutory provision displaces the common law in a particular area. *State v. Valdez*, 83 N.M. 632, 637, 495 P.2d 1079, 1084 (Ct.App.), *aff'd*, 83 N.M. 720, 497 P.2d 231; *State v. Hartzler*, 78 N.M. 514, 515, 433 P.2d 231, 232 (Ct.App.); N.M.Stat.Ann. § 30–1–3 (Repl.Pamp.1984); *see also State v. Willis*, 98 N.M. 771, 774, 652 P.2d 1222, 1225 (Ct.App.) (Wood, J., specially concurring). The New Mexico Court of Appeals described the common-law powers of a bondsman in its opinion. The New Mexico Court of Appeals has upheld a conviction for the common-law misdemeanor of "indecent handling of a dead body." *Hartzler*, 78 N.M. 514 at 516–18, 433 P.2d at 233–35. The court determined that four such cases decided in three states over a period of 146 years established the offense in the common law. Common-law defenses and privileges have been incorporated into New Mexico law in the same manner as common-law offenses. *See Downs v. Garay*, 106 N.M. 321, 742 P.2d 533 (Ct.App.) (considering the common-law citizen's arrest privilege as a defense to arrest and battery in the context of a civil suit).

No one disputes that at common law bail bondsmen had very broad arrest powers.

Courts frequently cite the Supreme Court opinion in *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 371–72, 21 L.Ed. 287, wherein the Court said:

"When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner."

*See also Ex Parte Salinger*, 288 F. 752, 755 (2d Cir.); *State v. Portnoy*, 43 Wash. App. 455, 718 P.2d 805, 811 (observing that "a bail bondsman has certain extraordinary powers under the common law"). Subsequent cases, often relying on the "if necessary" qualification in *Taylor*, have decided that the common-law right of recapture is limited by the reasonable means necessary to effect rearrest.

Numerous decisions have acknowledged the bail bondsman's common-law right to recapture includes the right to remove his principal from one state to another, without resort to extradition proceedings, in order to return the principal to the forum from which he was released and to which he obligated himself to surrender. *See Taylor*, 83 U.S. (16 Wall.) at 371–72; *Reese v. United States*, 76 U.S. (9 Wall.) 13, 21–22, 19 L.Ed. 541; *United States v. Goodwin*, 440 F.2d 1152, 1156 (3d Cir.); *Fitzpatrick v. Williams*, 46 F.2d 40, 41 (5th Cir.).

■ We must observe that *State v. Lopez* is the only case we have encountered holding that the long-standing UCEA, by itself, modifies the established rule that a bail bondsman need not resort to process— particularly extradition—in rearresting his principal in another state. As such, we do not believe that Mr. Lopez could have antic- ipated the court's holding. The state courts relied on *State v. Epps*, 36 Or.App. 519, 585 P.2d 425, but in *Epps* the Oregon court in turn relied heavily on the fact that the Oregon legislature had effected "a complete abandonment, not a reform, of the bail system." 585 P.2d at 429. Consonant with this approach, the legislature had there repealed the statute authorizing a bail bondsman to arrest his principal, adopted an entirely new "security release system," and amended the UCEA to conform with these changes. The court there determined that the UCEA was the only permissible vehicle for returning a bail-jumper to another state because no other statutory means existed, and because the court believed that the legislature expressly rejected the common-law bail system when it adopted the security release system. New Mexico, of course, retains the bail system and provisions giving bondsmen the power to arrest. Mr. Lopez could not have anticipated that New Mexico would follow the *Epps* decision with respect to his conduct.

The language of the UCEA could not have conveyed to Mr. Lopez a fair warning that his conduct would be regarded as criminal. The section under which the appeals court concluded that Mr. Lopez should have attempted the arrest of Mr. Ojinaga, § 31–4–13, is not mandatory by its terms. While the statute commands that the "judge or magistrate shall issue a warrant" for the arrest of any person who "shall be charged on the oath of any credible person" of one of several offenses, it does not specify that the credible person *must* seek the arrest of the charged person under the UCEA.

In our consideration of the doctrines in *Bouie* and *Devine* we must, as mentioned, resolve the issue as to whether the state court construction of the Uniform Act was so "unexpected" under preexisting law as to prevent its application retroactively. This again, as mentioned, must be made in the context of other statutory authority as we had done above, and also in reference to the then prevailing common law. Neither the UCEA itself nor the decisional prece-

dents of other states could have afforded Mr. Lopez a fair warning that his attempt to recapture Rudy Ojinaga in New Mexico would be governed by the UCEA, and thus not be privileged conduct under the common law.

■ The respondent asserts on appeal that even the broadest view of the bail bondsman's privilege could not shield Mr. Lopez's conduct in assaulting Deputy Henderson. Mr. Lopez responds that the jury "could very well have found that under the circumstances it was reasonable for Mr. Lopez to use force against persons he did not know were peace officers." Petitioner–Appellee's Brief at 15. The trial court's instruction adequately protected Mr. Lopez's interest on this point:

> "Evidence has been presented that the defendant, Albert Lopez, did not know Carl Henderson was a peace officer. If Albert Lopez acted under an honest and reasonable belief in the existence of those facts, you must find him not guilty."

Instruction Number 10, Record Vol. III, p. 462. Had the jury found that Mr. Lopez did not know that Deputy Henderson was a peace officer, they would never have had to reach the issue of the reasonableness of Mr. Lopez's conduct, as they would have acquitted him. Furthermore, we are aware of no case, under the common law or any other law, holding that a bail bondsman is privileged to engage in an armed standoff with a peace officer by virtue of his right to recapture his principal.

Because the decision of the New Mexico Court of Appeals was unforeseeable and retroactively rendered Mr. Lopez's conduct criminal by depriving him of the bail bondsman's privilege, it violated the due process clause. Therefore, we affirm the trial court's grant of the writ of habeas corpus with respect to the petitioner's convictions for attempted aggravated burglary and aggravated assault on Antonio Ojinaga. However, we reverse the trial court's grant of the writ of habeas corpus with respect to the petitioner's conviction for aggravated assault on Deputy Henderson.

It is so ordered and the case is remanded for further proceedings.