No. 90,441

STATE OF KANSAS, *Appellee,* v. CHARLES K. BURHANS, *Appellant.*

(89 P.3d 629)

Opinion filed May 14, 2004.

*Jessica R. Kunen,* of Lawrence, argued the cause and was on the brief for appellant.

*Bradley R. Burke,* assistant district attorney, argued the cause, and *Christine E. Kenney,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Charles Burhans, a bail bondsman, was convicted of criminal trespass and misdemeanor assault for his efforts in attempting to apprehend Michael Austin after revoking his bond. Following Burhans' appeal to the Court of Appeals, we transferred the case on our own motion pursuant to K.S.A. 20-3018(c).

The issues on appeal and this court's accompanying holdings are as follows:

1. Did the district court fail to properly apply the bondsman privilege? No.

2. Did Burhans' convictions violate his due process rights? No.

3. Did sufficient evidence support Burhans' convictions? Yes.

Accordingly, we affirm.

FACTS:

Jerome and Margaret Williams, husband and wife, own 2722 Rawhide Lane in Lawrence and have lived there for 20 years. Charles Burhans, a bail bondsman, was seeking to apprehend Mrs. Williams' brother, Michael Austin, whose bond had been revoked. According to Burhans, a bail agent for ABC Bail Bonds named Michelle Hattemer had asked him to help find Austin and had given him some paperwork, including an application for a bail bond filled out by Hattemer that listed 2722 Rawhide Lane as Austin's address.

Burhans did not have the actual bail bond, but he testified that Hattemer told him she believed Austin lived at 2722 Rawhide Lane. Burhans did not do a title search, did not check the utilities bills for that address, and did not talk to Yvonne Smith, whom Hattemer listed as the indemnitor on Austin's bond. Burhans did contact Cablevision, where the bail bond application indicated that Austin worked, but discovered that Austin had never worked there.

Burhans testified that he made several phone calls to 2722 Rawhide Lane, but never spoke to Austin. He had first called under the pretext that he was a landlord returning a deposit for Austin and needed to know where to send the check. According to Burhans, Mrs. Williams told him to send the check to 2722 Rawhide Lane, which she said was Austin's physical address. Mrs. Williams testified, however, that she never received a call from someone purporting to be Austin's former landlord. Moreover, she testified that Austin is homeless, has never had a job, and, while welcome to visit her home, has not been welcome to spend the night.

Mrs. Williams also testified that at the beginning of 2002, she had received several calls from a woman named Michelle, who told her that Austin was requesting Mrs. Williams to post bond. Mrs. Williams declined to do so. Michelle later called to see if Austin was there or lived there. Mrs. Williams told Michelle that Austin did not live there, but offered to take a message. She advised Michelle she did not know when she would hear from Austin. She had not seen him for several months.

Around 4 p.m. on April 24, 2002, Burhans came to 2722 Rawhide Lane and falsely told Mrs. Williams he was there to install a house security system. Mrs. Williams responded that she had not requested one and was sure her husband had not either. Burhans stated his appointment was with Mike Austin, and Mrs. Williams said Austin was not there. Continuing with his deception, Burhans then asked if he could step inside the house to use the Williams' phone to call his security company to verify he had the correct address. Mrs. Williams allowed him inside and handed him a cordless phone.

Halfway through the pretense of making a call, Burhans threw the phone down and announced, "I'm here to arrest Mike Austin." Mrs. Williams told him that Austin did not live there and asked Burhans to leave. Burhans refused, so Mrs. Williams pushed him out of the doorway with the door and shut the door.

Burhans told Mrs. Williams that he had the right to search for Austin. She warned him that if attempted to reenter the house, she would call the police. Burhans then said to go ahead and call the police. She also told him to get off the property. At about that time, Mr. Williams returned to the house after taking his grandson to baseball practice, and his wife told him what happened.

Burhans left the property and returned to his van, where he called the Lawrence Police Department for a courtesy standby. At 4:55 p.m., Officer Larry Lindsay arrived. Burhans told him he was trying to serve a revocation of bond on Michael Austin. Burhans showed Lindsay bond papers containing Austin's name and address, but told Lindsay that he did not know if Austin was in the residence. Burhans requested Lindsay's assistance because he anticipated problems when he went back to the house. Lindsay declined to standby because Burhans told him he had been to the residence, had made no attempts to verify whether Austin was in the residence, and had been asked to leave. Lindsay left at 5:11 p.m.

When Lindsay left, Burhans pulled his handgun from his van, stepped onto the Williams' driveway, and began heading toward the residence.

Mr. Williams testified he came out his front door onto the driveway and held up his hand to stop Burhans. He told Burhans that Austin was not there and to stop at the end of the driveway. Additionally, Williams told Burhans that he was not welcome to come into the yard and was trespassing. Burhans, now pointing a can of mace at Williams, continued walking up the driveway and insisted that he had a right to come in the house. When Williams told Burhans that the mace did not scare him, Burhans said, "Well, I have this," pointing to the handgun in his waistband.

Burhans testified that he felt threatened because Williams was coming very fast and yelling obscenities at him. For that reason he pulled his can of mace from his pouch and pointed it at Mr. Williams, warning that he would defend himself if necessary. According to Burhans, since Mr. Williams continued to move toward him, he tapped the can of mace on his handgun for the purpose of stopping Williams. Burhans testified, "at which time he [Williams] pretty much froze in his tracks."

Mr. Williams testified that Burhans' tapping the handgun with the mace cannister made him believe Burhans might use either the mace or his gun. Mr. Williams then yelled to his wife to call the police.

As a result of the call, Officer Lindsay returned to the scene at 5:18 p.m. He testified that when he arrived, Burhans and Mr. Williams were having a heated argument in the driveway. He observed that Burhans had a semiautomatic pistol tucked into his waistband, while Mr. Williams appeared to be unarmed.

A second officer, Mike McAtee, then arrived and spoke with Burhans while Lindsay spoke with Mr. and Mrs. Williams. Burhans told McAtee that he had gained entry into the house by tricking the residents. He then showed McAtee the bond revocation papers and stated he had a right to enter the residence because he had the bond paper on Austin.

Mr. Williams then offered to let Burhans search the house for Austin if he was accompanied by an officer and if he left his can of mace and handgun outside. Burhans refused. According to the officers, Burhans said he refused because he knew Austin was not in the residence and that he did not want to go back in there.

According to Officer McAtee, Burhans also told everyone present that he would or could return at any time looking for Austin and that he would enter the residence.

After a bench trial, the district court convicted Burhans of criminal trespass and misdemeanor assault, holding in relevant part:

"The individual, Mr. Burhans, given the information that Mr. Austin did not live there, the only information that he had to the contrary was the fact that Michelle Hattemer said that he had listed that address, but indicated that she had found out or at least was told that he wasn't — didn't live there, decided, in fact, that he did live there and proceeded back up to the driveway, indicating that he was going back into the place to look around, that [it] was his right to do so.

"The court does not believe under the laws of our state concerning a bail bondsman authority that under the facts of this matter that that was his right to do so. He was told to leave the premises. He came up armed with a can of mace and armed with a firearm and was told to leave.

"He indicated that he used — he tapped his mace onto the firearm in order to stop Mr. Williams from charging him. Of course, Mr. Williams was trying to prevent someone from trespassing onto his property, and he also indicated that he feared that this individual was trying to come back into his house and to his castle, so to speak.

"Certainly the idea of tapping a can of mace onto a firearm would result in what Mr. Williams indicated was a reasonable apprehension of bodily harm from this individual who had been told to leave. Under the facts of this case, the court does not find that the defense of a bail bondsman authority to apprehend or the self-defense apply."

## ANALYSIS:

Several core facts are important to our analysis of the issues.

1. Before Burhans entered the property at 2722 Rawhide Lane, the only information he had that Austin resided there was (a) Michelle Hattemer informing him that this address was listed as Austin's residence on his bail application and (b) Mrs. Williams allegedly informing him it was Austin's physical address, which she later denied.

2. The only efforts Burhans himself made to confirm Austin resided at 2722 Rawhide Lane were unsuccessful, with the possible exception of his claim that Mrs. Williams said it was Austin's physical address, which she later denied.

3. Burhans never observed Austin at 2722 Rawhide Lane, nor communicated with anyone who admitted to ever having observed Austin there.

Issue 1: *Did the district court fail to properly apply the bondsman privilege?*

Burhans claims that a bail bondsman has broad rights under the common law to enter property which he or she "reasonably believes" serves as the principal's residence and to arrest the principal. He also claims that a bail bondsman has broad rights under the common law to use such force there as is reasonably necessary to overcome the resistance of a third party who attempts to impede the principal's recapture. Accordingly, his convictions must be reversed.

The State acknowledges the bondsmans privilege, but argues Burhans was not privileged to enter the property or to attempt to overcome the resistance of Mr. Williams under the facts of this case, particularly because neither Burhans nor his information sources had observed Austin there.

Our standard of review is de novo, since we determine, as a matter of law, the reach of the bondsman privilege. See *State v. Harper*, 275 Kan. 888, 889, 69 P.3d 1105 (2003).

The right of a bondsman to arrest his principal was discussed in *Taylor v. Taintor*, 83 U.S. 366, 21 L. Ed. 287 (1872). The Court stated:

"When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; *and, if necessary, may break and enter his house for that purpose.* The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. In 6 Modern it is said: 'The bail have their principal on a string, and may pull the string whenever they please, and render him in their discharge.' The rights of the bail in civil and criminal cases are the same. They may doubtless permit him to go beyond the limits of the State within which he is to answer, but it is unwise and imprudent to do so; and if any evil ensue, they must bear the burden of the

consequences, and cannot cast them upon the obligee." (Emphasis added.) 83 U.S. at 371-72.

Kansas case law on the subject is minimal but generally consistent with the general principles articulated in *Taylor v. Taintor.* See, *e.g., State v. Midland Ins. Co.,* 208 Kan. 886, 889, 494 P.2d 1228 (1972). As the Court of Appeals most recently stated in *State v. Indemnity Ins. Co. of N. Amer.,* 9 Kan. App. 2d 53, 56, 672 P.2d 251, *rev. denied* 234 Kan. 1077 (1984):

" 'By the recognizance the principal is, in the theory of the law, committed to the custody of the sureties as to jailers of his own choosing, not that he is, in point of fact, in this country at least, subjected or can be subjected by them to constant imprisonment; *but he is so far placed in their power that they may at any time arrest him upon the recognizance and surrender him to the court and, to the extent necessary to accomplish this, may restrain him of his liberty.' "* (Emphasis added.)

A bondsman also has a statutory right to arrest his principal under K.S.A. 22-2809, which generally provides that any person who is released on an appearance bond may be arrested by such person's surety or any person authorized by such surety and delivered to a custodial officer of the court in any county in the state in which such person is charged.

Because of the paucity of case law in Kansas, we must look to other jurisdictions for specific guidance.

Burhans relies heavily upon a case which appears to be at the outer reaches of the published decisions regarding the bondsman privilege. In *Livingston v. Browder,* 51 Ala. App. 366, 285 So. 2d 923 (1973), a bondsman entered the residence of the principal's mother, *i.e.,* a third party's residence, without her consent and arrested the principal, who apparently was a nonresident. The appellate court reversed the bondsman's trespass conviction. Among other things, the court found that the right of a surety to capture his or her principal arises not only from common law and Alabama statutory law, but also from private rights established by the bail contract. 51 Ala. App. at 369. The court looked at the arrest powers of a police officer and concluded: "[A] bondsman does have the authority to arrest . . . when he sees his principal in the dwelling; when he properly identifies himself; and when he acts in a reason-

able manner to enter the dwelling to effectuate his arrest." 51 Ala. App. at 370.

*Livingston* does not broadly state, however, as Burhans suggests, that every entry into a third party's home is reasonable. The court there acknowledged that if the bondsman misrepresented his authority, or did not have authority, he might be guilty of trespass. 51 Ala. App. at 370. Additionally, *Livingston* is distinguishable from the instant case on critical facts. There, the bondsman actually saw the principal's car in front of the residence, actually saw him sitting in the living room watching television, and confirmed with the defendant's mother that he was there. By contrast, Burhans did not see Austin's vehicle in front of the Williams' residence, did not see Austin on the property, and certainly did not confirm Austin's presence with a resident; Mr. and Mrs. Williams both denied it.

Burhans also cites *State v. Mathis*, 349 N.C. 503, 515, 509 S.E.2d 155 (1998). There, bondsmen searched a house owned by the principal's mother, but in which the principal resided. The North Carolina Supreme Court rejected that part of the Alabama Court of Appeals decision in *Livingston,* which held that a surety could enter the home of a third party, *i.e.,* where the principal does not reside, without the consent of the owner. 349 N.C. at 513. It held:

"The right of the surety to enter the residence of his principal and to seize him arises as a matter of contract from the bond agreement which carries with it the principal's implied consent that the surety may seize him at any time and may use such force as is reasonably necessary to enter his residence at any time in order to do so. *The principal has no authority to authorize the surety, by contract or otherwise, to enter the residence of a third party in which the principal does not himself reside.* Therefore, the surety obtains no such power by virtue of the bond agreement." (Emphasis added.) 349 N.C. at 513.

The *Mathis* court did hold, however, that when the principal does reside in the house owned by another, the bond agreement allows sureties to break and enter his or her residence even though it may be shared by others. 349 N.C. at 515. Under these circumstances, "Sureties or their agents may use such force as is reasonably necessary to overcome the resistance of a third party who attempts to impede their privileged capture of their principal. But

they may use only such force as is reasonably necessary under the circumstances to accomplish the arrest." 349 N.C. at 514.

The North Carolina Supreme Court held the trial court should have instructed the jury on a bondsman's common-law and statutory authority and reversed and remanded for a new trial, stating: "[A] jury could find from such evidence that the bondsmen here had a *reasonable belief* that Mr. Tankersley [principal] was in his or her residence, that Mrs. Nelson [homeowner] was interfering with the arrest, and that the bondsmen were justified in using the force necessary to enter and seize Mr. Tankersley." (Emphasis added.) 349 N.C. at 516.

Burhans essentially relies upon this "reasonable belief" language to support his claim that, under our facts, he had a right to enter the Williams' property to apprehend Austin. As with *Livingston,* however, *Mathis* is of little assistance to Burhans because its important facts are distinguishable from the instant case. Specifically, the principal, Tankersley, actually resided at the location, albeit with numerous family members. Furthermore, as in *Livingston,* the bondsman surveilling the residence actually saw the principal there. In addition, other bondsmen saw a car appear in the yard outside the residence that the principal had listed as his vehicle on his bond papers.

Even if we were to accept a "reasonable belief" as a basis for the bondsman privilege, it would not protect Burhans under the facts of this case. First, as the district court found:

"Mr. Austin, it appears, gave the address of his sister as his residence. It appears the only verification that the defendant used to determine that was from the information from Michelle Hattemer herself, who indicated that was the address written down on the bond sheet.

"In addition to that, Ms. Hattemer had been told by the alleged victims in this case that this gentleman, Michael Austin, did not live at the residence."

Second, Burhans did not actually see Austin's vehicle or Austin himself on the property.

Accordingly, even if 2722 Rawhide Lane were Austin's residence, which it was not, Burhans could not have had a reasonable belief that Austin actually was *in* his residence.

The State also cites a number of cases which appear to reject the principle that a bondsman has any right to forcibly enter a third party's dwelling to arrest the principal.

Foremost among these is *State v. Mishler*, 660 N.E.2d 343 (Ind. App. 1996). There, the defendant bondsmen were charged with battery and trespass after forcibly entering the apartment of the principal's mother and knocking her off balance. Apparently, the principal did not reside there, as the court first held that *Taylor v. Taintor* did not address a bail bondsman's forcible entry into the dwelling of a third party and was therefore inapplicable.

The *Mishler* court next indicated it found three states that had rejected the argument that a bail agent has the right to break and enter a third party's dwelling. 660 N.E.2d at 346; See *State v. Tapia*, 468 N.W.2d 342, 344 (Minn. App. 1991) (none of the sources from which a bail bondsman derives his or her authority — the common law, state statute, or the bail bondsman's contract — authorize the bondsman to forcibly enter the private dwelling of a third party to arrest the principal); *State v. Lopez*, 105 N.M. 538, 543-44, 734 P.2d 778 (Ct. App. 1986) (bail bondsman is not absolved of criminal responsibility for armed, forcible entry of third party residence); and *State v. Portnoy*, 43 Wash. App. 455, 466, 718 P.2d 805 (1986) (court upheld bondsman's conviction for assault of a neighbor who was present in the principal's home, rejecting claim that bondsman may sweep from his path all third parties whom he believes are blocking his search for his client without criminal liability). See also *Herd v. State of Maryland*, 125 Md. App. 77, 118-19, 724 A.2d 693 (1999) ("The legal conclusion that a bail bondsman is generally entitled to enter, without consent by the homeowner, the home of a third person in an effort to apprehend a fugitive is almost certainly an unreasonable conclusion.").

The *Mishler* court joined these jurisdictions, specifically concluding that none of the sources from which a bail agent derived his or her authority — common law, statute, or the bail agent's contract — authorized a bondsman to forcibly enter the private dwelling of a third party to arrest the principal. 660 N.E.2d at 347. The court also particularly determined that *Livingston* was inapplicable because the *Mishler* defendants did not see the principal

in the dwelling, but only speculated that he was there. They saw only the mother's car outside; no one saw the principal there; and the mother specifically told the bondsmen that the principal was not there. 660 N.E.2d at 347. The only information they had suggesting the principal was present was from his cousin who advised he *might* be at his mother's. The court affirmed the convictions.

Accordingly, the majority of the jurisdictions which have addressed the same issue as Burhans' also would agree that his privilege does not protect him on the Williams' property when the principal Austin does not reside there, and especially when Austin has not been observed there.

Burhans also argues he had the right to point a can of mace at Mr. Williams and to gesture toward a semiautomatic handgun tucked into the waistband of his pants. He claims that a bail bondsman is allowed to use reasonable force against a third party to effectuate the arrest of his principal. Burhans cites a Virginia trial court decision, *Commonwealth of Virginia v. Trevor W. Lyon*, 45 Va. Cir. 191 (1998), which is not authoritative, and the previously quoted language from *Mathis* to support this claim.

The State in turn relies on *Mishler, Tapia, Lopez, Herd,* and *Portnoy* to argue that restrictions are placed on the use of force and that several states, *i.e.*, Indiana, New Mexico, and Washington have upheld criminal convictions of bail bondsmen using force against third parties when searching for their principal.

As previously established, Burhans had no right to enter the property at 2722 Rawhide to search for Austin. Accordingly, his use of force there, or threat to use force against Williams was unreasonable and unprotected by any bondsman privilege.

We have found no case protecting any conduct like Burhans' when the bondsman did not actually see the principal on the property. We therefore need not determine whether Kansas should adopt the far-reaching rationale of *Livingston,* the "reasonable belief" rationale of *Mathis,* or the rationale of the majority of the states which have addressed the issue. Under any of these standards, under our facts, Burhans was unprotected.

Issue 2: *Did Burhans' convictions violate his due process rights?*

Burhans next claims that if the district court were correct in holding that the bondsman privilege did not protect his conduct,

then that determination violated his right to notice — that his conduct was criminal — under the Due Process Clause of the Fourteenth Amendment.

The due process issue involves a question of law, over which we have de novo review. See *Hemphill v. Kansas Dept. of Revenue*, 270 Kan. 83, 89, 11 P.3d 1165 (2000).

Burhans claims that he could not have known that entering the property of a third party, which the principal had listed as his residence, would be criminal conduct. As support he cites *Lopez v. McCotter*, 875 F.2d 273, *cert. denied* 493 U.S. 996 (10th Cir. 1989), where the court found Lopez could not have anticipated the lower court's holding that the Uniform Criminal Extradition Act modified the established rule that a bail bondsman need not resort to process in rearresting his principal in another state. 875 F.2d at 277. The 10th Circuit Court of Appeals found that no court had previously come to the same conclusion as the lower court and that the statute therefore did not convey a fair warning that Lopez's conduct was criminal.

Burhans also alludes to *Bouie v. City of Columbia*, 378 U.S. 347, 351, 12 L. Ed. 2d 894, 84 S. Ct. 1697 (1964) (quoting *U.S. v. Harriss*, 347 U.S. 612, 617, 98 L. Ed. 989, 74 S. Ct. 808 [1954]), in which the Court held: " 'The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' "

The State responds that the statutes at issue, K.S.A. 2001 Supp. 21-3721, criminal trespass, and K.S.A. 21-3408, assault, have been in effect in Kansas for decades. It also points out that K.S.A. 21-3203 clearly defines when ignorance or mistake as to a matter of either fact or law constitutes a defense:

"(1) A person's ignorance or mistake as to a matter of either fact or law, except as provided in section 21-3202, is a defense if it negatives the existence of the mental state which the statute prescribes with respect to an element of the crime.

"(2) *A person's reasonable belief that his conduct does not constitute a crime is a defense if:*

(a) *The crime is defined by an administrative regulation or order which is not known to him and has not been published in the Kansas administrative regulations or an annual supplement thereto, as provided by law; and he could not have*

*acquired such knowledge by the exercise of due diligence pursuant to facts known to him; or*

(b) *He acts in reliance upon a statute which later is determined to be invalid; or*

(c) *He acts in reliance upon an order or opinion of the supreme court of Kansas or a United States appellate court later overruled or reversed;*

(d) *He acts in reliance upon an official interpretation of the statute, regulation or order defining the crime made by a public officer or agency legally authorized to interpret such statute.*

"(3) Although a person's ignorance or mistake of fact or law, or reasonable belief, as described in subsection (2) of this section, is a defense to the crime charged, he may be convicted of an included crime of which he would be guilty if the fact or law were as he believed it to be." (Emphasis added.)

The State argues that Burhans did not act in reliance upon any of these statutory factors, and therefore, he cannot claim ignorance as a valid defense. It further argues that Burhans admitted that the bondsman privilege to arrest was a gray area of law, but that he acted anyway, without knowing the law or confirming that Austin was present at the residence. Finally, the State contends that even under the broadest understanding of the bondsman privilege, Burhans' actions were not reasonable and would not constitute a defense.

Although this area of law has not been thoroughly addressed by our courts, we agree with the State. The criminal statutes for trespass and assault are not being construed in a way that would have prevented Burhans from reasonably understanding that his conduct was proscribed; as the State points out, they have been in force for decades. Moreover, as stated earlier, we have been unable to find any case law from any jurisdiction which, under the facts of the instant case, would have even suggested to Burhans that his actions would be privileged. Even in *Livingston,* which appears to represent the outer reaches of the bondsman privilege, the defendant bondsman actually saw the principal on the property of the third party, a sighting which was confirmed by the homeowner-mother.

We conclude Burhans was sufficiently placed on notice that his actions would be criminal, not privileged. Consequently, his due process rights were not violated.

Issue 3: *Did sufficient evidence support Burhans' convictions?*

Burhans also challenges the sufficiency of the evidence for both of his convictions. Our standard of review for claims of insufficient evidence is well-known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Kunellis*, 276 Kan. 461, Syl. ¶ 10, 78 P.3d 776 (2003).

*Criminal trespass*

K.S.A. 2001 Supp. 21-3721(a) states in relevant part:

"(a) Criminal trespass is:
(1) Entering or remaining upon or in any land, nonnavigable body of water, structure, vehicle, aircraft or watercraft other than railroad property as defined in K.S.A. 2001 Supp. 21-3761 and amendments thereto *by a person who knows such person is not authorized or privileged to do so, and:*
(A) *Such person enters or remains therein in defiance of an order not to enter or to leave* such premises or property personally communicated to such person by the owner thereof or other authorized person." (Emphasis added.)

This court has previously acknowledged:

"The criminal trespass statute is not a model of clarity, and it could be said that the notice provision under the statute seems to be superfluous because the statute also requires knowing unauthorized entry. Our responsibility, however, is to give effect to all portions of the statute and reconcile different provisions 'in a way that makes them consistent, harmonious, and sensible.' [Citation omitted.] If reasonably possible, this court is to avoid statutory constructions that make part of a statute surplusage." *State v. Rush*, 255 Kan. 672, 677, 877 P.2d 386 (1994).

Nevertheless, the *Rush* court went on to conclude: "[T]he legislature intended that a trespasser must enter property knowingly and without authority and the State must present evidence of actual or constructive notice in order to support a criminal trespass conviction." 255 Kan. at 678.

Burhans primarily claims that after he left the house, he had the authority as a bondsman to return to and remain on the property. This position was decided against him in issue 1.

Moreover, the evidence showed that Burhans entered the residence at 2722 Rawhide Lane under the pretext of installing a se-

curity system, which undermines his argument that he had authority or privilege to enter the property. Additionally, he was told that Austin was not there and did not reside there. When he announced his true purpose — to arrest Austin — Mrs. Williams told him to leave the house and used the door to push him out. She also told him to leave the property altogether.

Burhans left the property, but soon returned to the driveway. As he approached the house, Mr. Williams told him to stop, that Austin was not there, that Burhans was not welcome, and that he was trespassing. Despite this second notice that Burhans had no authority or privilege to remain, and despite this second order to leave, Burhans continued to approach the house. Burhans clearly reentered the property and remained there in defiance of Mr. and Mrs. Williams' orders to leave. The evidence, viewed in the light most favorable to the prosecution, supports his conviction for trespass.

*Assault*

K.S.A. 21-3408 states: "Assault is intentionally placing another person in reasonable apprehension of immediate bodily harm."

Burhans claims that the evidence failed to show that Mr. Williams had a reasonable apprehension of immediate bodily harm. This argument is diluted by Burhan's own testimony. He testified that Williams was advancing on him, so he tapped the semiautomatic handgun in the waistband of his pants with a can of mace, which had the desired effect; Williams "pretty much froze in his tracks."

Burhans further claims that Mr. Williams never testified that he had a reasonable apprehension of immediate bodily harm. Even so, Mr. Williams testified that when the handgun was tapped, he believed that Burhans might use either the mace or the gun. When Burhans drew Mr. Williams' attention to his handgun in his waistband, Mr. Williams yelled to his wife to call the police.

The evidence, when viewed in the light most favorable to the prosecution, supports his conviction for assault.

Burhans also claims that he was using reasonable force to overcome the resistance of a third party who was attempting to impede

his privileged search for Austin. His bail bondsman privilege did not protect him under these circumstances, as discussed in issue 1. He was a trespasser and was required to withdraw from the field without provoking potential combat, not to advance on an unarmed homeowner standing on his own property. To paraphrase the United States Supreme Court in *Taylor v. Taintor*, 83 U. S. at 372, in 1872: If any evil ensue, the bondsman must bear the burden of the consequences.

Affirmed.