NOT DESIGNATED FOR PUBLICATION

No. 117,757

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEPHEN CHARLES JENNINGS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Opinion filed November 30, 2018. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON and GARDNER, JJ.

PER CURIAM:  After a bench trial, Stephen Charles Jennings was convicted of battery and criminal trespass. Jennings now appeals, claiming the State presented insufficient evidence at trial to support his convictions. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Around 10 p.m. on December 4, 2016, the Topeka Police Department dispatched Officer Randall Batman to investigate a 911 call from a residence on SW Taylor Street. A

female caller reported that there were two suspicious people walking through the alley behind her house and possibly in her back yard. Officer Emily Hren was dispatched to assist Batman. Each officer testified that dispatch had informed them that there was a 911 call from a female inside the home who stated she was being held against her will and the people inside did not belong there. Batman stated that dispatch also advised the caller was hiding in a closet.

After Hren arrived, Batman knocked on the front door several times and heard a male voice yelling inside, but no one answered. Hren walked around the north side towards the back and noticed a basement window cover was moved and the window was open. Hren looked up and saw a black male pacing in the kitchen. Eventually, two people—later identified as Jennings and Tawana Perkins—exited the back door. Batman did not determine whether the back door was locked before Jennings and Perkins exited.

Batman testified that Jennings was cooperative but appeared intoxicated because he spoke with a loud voice, he did not answer questions directly, and he repeated himself. Jennings told Batman he had permission from his friend Norman Anderson—who was currently incarcerated—to stay at the home and look after Anderson's wife and child. Jennings stated that he had clothing and property in the basement and that there was no one else inside the home. Based on the 911 calls, Batman asked Jennings whether he could check the house. Jennings responded, "Nobody's inside" and made a statement that if someone was inside, they would be hiding in a closet.

Batman came into contact with Terica Gardner inside the home. Gardner told Batman she lived there with her husband, Anderson, who was incarcerated, and that she knew Jennings as Anderson's friend who came over and kept some clothes and property in the basement. Batman testified that Gardner told him she let Jennings into her home earlier that day to use the restroom and change his clothes. While inside, Jennings drank alcohol, became belligerent with Gardner, and then left. After he left, Gardner locked all

2

the doors. When Jennings returned, he demanded that Gardner let him in and started banging on the front door and windows. Gardner told Jennings to go away, but he entered the house through a window. Once inside, Jennings was physically and verbally aggressive and struck Gardner several times in the face with a closed fist and possibly her kidney. After the altercation with Jennings, Gardner grabbed her child, went to her bedroom closet, and called 911.

Hren photographed the injuries to Gardner's face and lip. The record on appeal does not include the photographs. Hren testified that Gardner appeared emotionally upset and was crying, so she asked Gardner who hit her. Gardner told Hren that the male hit her. When Hren and Gardner went into the living room, Hren saw that furniture and other items were in front of the door. Hren asked Gardner if that was where they barricaded her in, and Gardner responded in the affirmative.

Batman admitted he never confirmed with Anderson whether he gave Jennings permission to stay at the home. But Batman did ask Jennings why a piece of plywood covering a window was pried back, and Jennings stated he got into the house at some point through that window. Batman did not know if Jennings had pried back the plywood that day or at another time. Hren stated that the plastic seal on one window was peeled away as if someone had made entry and that Jennings had told Batman he entered the house through a door or a window.

Batman stated that he usually determines if a person belongs at a property based on whether the person has control, such as an ownership or other interest in the property. Batman testified that he would view a person as having a property interest if the person kept clothing and belongings in the home or had utilities in his or her name. Batman testified that he did not believe Gardner consented to Jennings entering her home when he returned that night. Following the investigation, the State later charged Jennings with criminal restraint, battery, criminal trespass, and criminal damage to property.

3

Gardner testified at the bench trial that her neighbor called 911; she denied calling 911 and informing the police she was hiding in a closet. Gardner stated that—based on her knowledge—Anderson only gave Jennings permission to check in to make sure she and her son were okay and to store his belongings in the basement. Gardner said that she allowed Jennings to store clothes in the basement and to stay at the house a couple of nights. Gardner admitted that Jennings turned on the water and gas but she did not know whether Jennings put the utilities in his name.

Gardner also testified that she gave Jennings and Perkins permission to enter the house earlier that day. Jennings consumed no food or drink but only came inside, used the restroom, changed clothes, and left. About 20 to 30 minutes later, however, Jennings and Perkins returned drunk. Jennings did not ask and was not invited inside, and Gardner assumed that he knew he lacked permission to enter because she told him to sober up before he returned. Gardner stated she kept the doors locked and the doors were locked when Jennings and Perkins returned, so she did not know how they entered. Gardner did not believe they entered through the front door and stated that the plastic seals were removed from several windows that day.

Gardner described Jennings' and Perkins' behavior once inside as ranting and raving. According to Gardner, Jennings stated, "'Nobody's getting this bitch, and nobody's getting out of this bitch. We're on lockdown,'" and Jennings and Perkins started to barricade the front door with wood and furniture. Gardner testified that Jennings hit her on her left side when she tried to stop him, but she could not recall if his fist was open or closed.

Jennings testified in his defense. Jennings admitted that he had no key to and did not own the home. But he stated that Anderson asked him to go to Anderson's house, turn on the water and gas utilities, and gave him permission to stay in the basement. Jennings stated that he and Perkins spoke to Gardner and then put the water bill in Perkins' name

4

and the gas bill in his name. On the day the police showed up at the house, Jennings had been living there for about a month. Jennings and Perkins had been out all day, bought some groceries, and returned to what he thought was an empty house. Jennings stated that he entered through the unlocked or messed up back door, and Perkins started cooking dinner when the police arrived. Jennings told the police he had permission to be there; the bills were in his and Perkins' name; and they lived in the basement where he had a bed, clothing, and other belongings.

Jennings denied striking anyone and stated he did not remember telling the police that if someone was inside, they were hiding in a closet because he did not know anyone was there. Jennings also stated that Anderson had messed with the plywood covering the window at an earlier time and that Gardner and her friend had barricaded the front door because the door frame was messed up and anyone could walk into the house.

At the bench trial, the district court acquitted Jennings of criminal restraint and criminal damage to property but found him guilty of battery and criminal trespass. At sentencing, the district court sentenced him to an underlying, controlling 4-month jail term but granted Jennings 12 months' probation.

Jennings timely appeals.

DID THE STATE PRESENT INSUFFICIENT EVIDENCE TO SUPPORT JENNINGS' BATTERY AND CRIMINAL TRESPASS CONVICTIONS?

Jennings challenges the sufficiency of the State's evidence.

"'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In making a

sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.' An appellate court will reverse a guilty verdict even if the record contains some evidence supporting guilt only in rare cases when the court determines that evidence was so incredulous no reasonable fact-finder could find guilt beyond a reasonable doubt. [Citations omitted.]" *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

A.    *Battery*

Jennings argues that insufficient evidence supports his battery conviction because (1) the physical contact with Gardner could have been accidental and (2) the State did not prove that he knowingly caused physical contact with Gardner.

Under K.S.A. 2016 Supp. 21-5413(a)(2), the State had to prove that Jennings committed battery by "knowingly causing physical contact with another person when done in a rude, insulting or angry manner."

Under K.S.A. 2016 Supp. 21-5202(i),

"[a] person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result."

The State presented sufficient evidence that Jennings knowingly—not accidentally—caused physical contact with Gardner in a rude, insulting, or angry manner. At trial, Jennings denied striking anyone. Gardner initially told Batman that Jennings became physically and verbally aggressive towards her and struck her with a closed fist several times, but she could not recall if Jennings' fist was open or closed at trial. Gardner

6

testified that Jennings hit her on the left side when she tried to stop him from barricading the front door, and Hren photographed Gardner's injuries. When viewing this evidence in a light most favorable to the State, a rational fact-finder could have found Jennings guilty of battery beyond a reasonable doubt.

B.    *Criminal Trespass*

Jennings also argues insufficient evidence supports his criminal trespass conviction because (1) he was a tenant, not a guest and (2) Gardner merely assumed that he knew he did not have permission to enter the house the second time.

K.S.A. 2016 Supp. 21-5808(a)(1)(B) states:

"(a) Criminal trespass is entering or remaining upon or in any:

(1) Land, nonnavigable body of water, structure, vehicle, aircraft or watercraft by a person *who knows such person is not authorized or privileged to do so*, and:

. . . .

(B) such premises or property are posted as provided in K.S.A. 32-1013, and amendments thereto, or in any other manner reasonably likely to come to the attention of intruders, or are locked or fenced or otherwise enclosed, or shut or secured against passage or entry." (Emphasis added.)

"A trespasser must enter property knowingly and without authority and the State must present evidence of actual or constructive notice in order to support a criminal trespass conviction." *State v. Burhans*, 277 Kan. 858, Syl. ¶ 3, 89 P.3d 629 (2004).

Jennings' arguments require us to reweigh the evidence, resolve evidentiary conflicts, and make credibility determinations, which we cannot do. See *Torres*, 308 Kan. at 488. Jennings first argues his criminal trespass conviction requires reversal because he was a tenant, not a guest. But Jennings cites no authority for his claim. See *State v. Gonzalez*, 307 Kan. 575, 592, 412 P.3d 968 (2018) ("When a party fails to brief an issue, that issue is deemed waived or abandoned."). Jennings did not own and had no key to the home. Gardner testified she allowed Jennings and Perkins to stay a couple of nights and that Jennings turned on the gas and water utilities. But Gardner did not know if Jennings put the utilities in his name. Gardner stated that she believed that her husband, Anderson, only gave Jennings permission to keep some belongings in the basement and to check on her and her son. Gardner told Batman that Jennings asked to enter the home earlier that day to use the bathroom and change clothes. The State presented evidence that Gardner told Jennings not to return until he sobered up, locked the doors after he left, and told Jennings to leave when he returned and demanded entry. Although Jennings had some property interests, the State presented sufficient evidence that Jennings' authority or privilege to enter the home was limited.

The above evidence also provides sufficient evidence that Jennings knew that he lacked any authority or privilege to reenter the house. Specifically, Gardner told Batman she locked the doors after Jennings left because he drank alcohol and became belligerent with her. Batman testified that Jennings appeared intoxicated when he spoke with him. Although Gardner's testimony differed some from her prior statements, Gardner testified she assumed Jennings knew he could not enter because she told him not to return until he sobered up. Gardner also told Batman that she told Jennings to go away when he returned to the house and demanded entry. Gardner stated at trial that she did not know how Jennings entered the home, but she told Batman he entered through a window and that all the doors were locked. The evidence showed that plastic seals were peeled off some windows, the plywood covering one window was pried back, and one window was moved and open when the police arrived. Although Jennings had permission to enter the

8

home earlier in the day, there is sufficient evidence to establish that Gardner revoked his authority or privilege after he left, and Jennings knew he could not reenter the home. In reviewing the evidence in a light most favorable to the State, a rational fact-finder could have found Jennings guilty of criminal trespass beyond a reasonable doubt.

Affirmed.