The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Jason Richard ORAM, Defendant–Appellant.

No. 07CA0023.

Colorado Court of Appeals, Div. II.

Feb. 5, 2009.

John W. Suthers, Attorney General, Katherine A. Hansen, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Michael C. Mattis, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge TAUBMAN.

Defendant, Jason Richard Oram, appeals the judgment of conviction entered upon jury verdicts finding him guilty of second degree burglary and felony menacing. He contends his burglary conviction should be reversed based on his reliance on the common law bonding agent's privilege. We conclude there is a common law bonding agent's privilege in Colorado, but that it did not justify Oram's entry into the home at issue. Accordingly, we affirm.

## I. Background

Oram and his codefendant, Devon Scott Weinstein, were "bounty hunters" or bond recovery agents (collectively agents). LaDonna's Bail Bonds (LaDonna's), a commercial bail bonds company, posted bond for John E. Vigil (Vigil) on a drug charge. Vigil completed a bond application and agreement for surety bail bond with LaDonna's. Vigil listed 1446 King Street in Denver as his address, but he did not live there. Further, Vigil listed that he was 5′8″, 128 pounds, Hispanic, with brown eyes and hair, and that his birthday was February 2, 1948.

Vigil failed to appear for a scheduled court appearance, prompting Jefferson County to

issue an arrest warrant for him. A copy of the failure to appear notice was sent to LaDonna's, which the bond company considered a violation of Vigil's bond agreement. Thereafter, LaDonna's hired Oram and Weinstein to locate and apprehend Vigil.

On August 2, 2004, LaDonna's gave Oram and Weinstein a copy of its file on Vigil. The agents also obtained a copy of Vigil's file at the Jefferson County courthouse, where they confirmed that Vigil's arrest warrant was still active and that he was not in police custody. Also, at the courthouse, the agents unsuccessfully attempted to obtain Vigil's photograph.

Next, the agents tried but were unable to contact Vigil by telephone, using the phone numbers he had provided. At approximately 9 p.m. on August 2, the agents arrived at the King Street residence and began surveillance of the house and surrounding area. After an hour, they approached the front door. Oram testified that he and Weinstein had taser guns. Two occupants appeared at the door, G.V., the owner of the residence, and J.M., another resident. Also inside was a third resident, Z.V. Eugene Vigil, Vigil's brother, also resided at the residence, but was not home at the time.

G.V. testified that she reached for the door latch and as she did so, the door flew open and Weinstein swung her out onto the porch and put a gun to her head. J.M. provided similar testimony.

Weinstein asked G.V. and J.M. for their names, and Oram testified that he thought the male occupant, J.M., answered "John." Weinstein entered the house, and Oram testified that he saw J.M. take an aggressive step toward Weinstein. Oram then forced J.M. to the floor and handcuffed him. Oram claimed he did not have a clear view of J.M. in the darkness, but that his height and build matched Vigil's description. After Oram saw that J.M. was not old enough to be Vigil, and after Z.V. produced J.M.'s identification, the agents removed the handcuffs from J.M.

Eugene Vigil arrived at the house during the incident. The agents asked Eugene Vigil and the other occupants the whereabouts of Vigil. However, none of them knew Vigil's location. Eugene Vigil contacted the agents approximately one hour later and told them Vigil was in police custody in Denver.

The agents did not identify themselves as bounty hunters. The occupants testified that the agents had represented themselves as a police officer and a federal agent and that they were investigating a claim or a disturbance. The day after the incident, G.V. called the police when she became suspicious that Oram and Weinstein were not law enforcement officials.

At trial, the prosecution's motion for joinder to try Oram and Weinstein as codefendants was granted over Weinstein's objection. At the conclusion of the prosecution's case, the defense moved for a judgment of acquittal on the burglary charge. The trial court denied the motion. Weinstein did not testify at trial, while Oram did.

## II. Sufficiency of the Evidence

Oram contends that his second degree burglary conviction should be vacated because there was insufficient evidence to prove beyond a reasonable doubt all the elements of the offense. Oram maintains that he was authorized as a bond recovery agent by statute, common law, and Vigil's bond agreement to enter the residence. We reject this contention and hold that the evidence was sufficient to support his convictions.

■ We must view the evidence in the light most favorable to the prosecution and determine whether it is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty beyond a reasonable doubt as to the elements of the charge. *People v. Martinez*, 165 P.3d 907, 913 (Colo.App.2007).

■ The credibility of the witnesses is solely within the province of the jury; the trial court may not determine what specific weight is given to pieces of evidence; a modicum of relevant evidence will not rationally support a conviction beyond a reasonable doubt; and the verdict may not be based on guessing, speculation, or conjecture. *People v. Sprouse*, 983 P.2d 771, 777–78 (Colo.1999). If there is evidence upon which one may reasonably infer that the elements of the

crime have been established, the evidence is substantial and sufficient. *People v. Montano*, 195 Colo. 420, 423, 578 P.2d 1053, 1055 (1978).

The second degree burglary statute provides:

A person commits second degree burglary, if the person knowingly breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in a building or occupied structure with intent to commit therein a crime against another person or property.

§ 18–4–203(1), C.R.S.2008.

In this case, the jury was provided with the following instruction 13,

The elements of the crime of Second Degree Burglary are:

(1) That the Defendant,

(2) in the City and County of Denver, State of Colorado, on or about August 2, 2004,

(3) knowingly

(4) unlawfully entered or remained unlawfully in, the dwelling of another,

(5) with intent to commit therein the crime of Menacing,

(6) without the affirmative defense in Instruction No. 16.

After considering all the evidence, if you decide the prosecution has proven each of the elements beyond a reasonable doubt, you should find the Defendant Guilty of Second Degree Burglary.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the Defendant Not Guilty of Second Degree Burglary.

The affirmative defense instruction, discussed in part III below, provided that it was an affirmative defense to the charged crimes if the jurors found that Oram acted as a "reasonable bonding agent" in the circumstances surrounding the attempted arrest of Vigil.

Oram contends that the evidence was insufficient to prove (1) that he entered or remained in the residence unlawfully; (2) that he knew he was entering or remaining in the residence unlawfully; and (3) that he intended to commit the crime of menacing in the residence. We consider each contention in turn.

## A. Evidence of Unlawful Entering or Remaining

Oram argues the evidence was insufficient to support the element of entering or remaining unlawfully in a dwelling. We disagree.

■ Whether Oram entered the residence unlawfully is a mixed question of law and fact. Viewing the facts in the light most favorable to the People, we review de novo the legal issue of unlawful entry. *See People v. Harrison*, 165 P.3d 859 (Colo.App.2007). To determine the legal issue of whether there was sufficient evidence that Oram entered the residence unlawfully, we must first determine the extent of Oram's authority to enter or remain in the residence. Oram contends that, as a bonding agent, he had such authority based on statute, the common law, and the bail bond contract. *See State v. Tapia*, 468 N.W.2d 342, 343 (Minn.Ct.App. 1991).

### 1. Statutory Authority

Under statute, a surety shall be exonerated from a bail bond when the defendant is surrendered "into custody at any time before a judgment has been entered against the sureties for forfeiture of the bond," and a "surety may seize and surrender the defendant to the sheriff of the county wherein the bond is taken." § 16–4–108(1)(c), C.R.S.2008.

The People contend that section 16–4–108(1)(c) abrogated any common law bonding agent's privilege in Colorado and that, under the second degree burglary statute, section 18–4–203, C.R.S.2008, Oram could not lawfully enter the residence. Oram in turn maintains that section 16–4–108(1)(c) did not abrogate the common law bonding agent's privilege in Colorado because that statute did not specifically or expressly repeal it. We agree with Oram in part, but conclude that the bonding agent's privilege in Colorado is narrower in scope than he asserts.

In Colorado, the common law of England continues to apply unless it has been "repealed by legislative authority." § 2–4–211, C.R.S.2008. To manifest its intent to abrogate a common law right, the General Assembly must do so either by explicit statutory language or by clear implication. *Leader Federal Bank for Savings v. Saunders,* 929 P.2d 1343, 1348 (Colo.1997); *see also Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991).

The exoneration statute, section 16–4–108(1)(c), recognizes the bonding agent's authority to seize a principal. However, unlike the common law, the statute does not prescribe how a surety may exercise his or her power to seize a principal. *See Tapia,* 468 N.W.2d at 344 (a Minnesota statute, Minn.Stat. § 629.63 (1990), granted the same arrest powers to a surety, but similarly did not prescribe how the power should be exercised). Thus, section 16–4–108(1)(c) does not answer the question whether Oram had lawful authority to enter and remain in the residence. Accordingly, by enacting this statute the General Assembly did not explicitly or implicitly repeal the common law limitations on the exercise of the bonding agent's privilege.

### 2. Common Law Authority

Oram contends that the language in *Taylor v. Taintor,* 16 Wall. 366, 83 U.S. 366, 21 L.Ed. 287 (1872), describing the common law bonding agent's privilege, which was nearly identical to a provision in Vigil's bond agreement, authorized his forcible entry into the King Street residence. Conversely, the People contend that the reliance on *Taylor* is misplaced because the bonding agent's privilege language is dicta. Although we agree that the bonding agent's privilege language in *Taylor* is dicta, we conclude that the common law bonding agent's privilege exists in Colorado. We further conclude the privilege did not authorize Oram's entry into the residence unless it was Vigil's, Vigil was present, and it was necessary to enter to seize him.

At common law, bail sureties had very broad seizure powers. *Lopez v. McCotter,* 875 F.2d 273, 277 (10th Cir.1989). In *Taylor,* the Supreme Court discussed a surety's right at common law to seize a principal, stating:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

83 U.S. at 371.

*Taylor* held, in the extradition context, that the first tribunal to have jurisdiction over a principal may exclude another tribunal, until the jurisdiction invoked is exhausted. *Id.* at 370. Thus, the bonding agent's privilege language quoted above is dicta. *See, e.g., Landry v. A–Able Bonding, Inc.,* No. 1:92–CV–0257, 1994 WL 575480 (E.D.Tex. May 9, 1994), *aff'd in part and rev'd in part,* 75 F.3d 200 (5th Cir.1996); *Hayes v. Goldstein,* 120 Ohio App.3d 116, 697 N.E.2d 224, 227 (1997) (Matia, J., dissenting); *see also* Todd C. Barsumian, Note, *Bail Bondsmen and Bounty Hunters: Re-examining the Right to Recapture,* 47 Drake L.Rev. 877, 887–88 (1999). Nonetheless, that does not end the inquiry into the scope of the common law bonding agent's privilege.

Our review of authorities, as discussed below, leads us to conclude that the common law bonding agent's privilege is consistent with the dicta in *Taylor.* That privilege allows a bond recovery agent to enter a principal's house to seize the principal and deliver him or her to the custody of the surety when the entry into the principal's residence is necessary.

Although the trial court did not instruct the jurors on the bonding agent's privilege as set forth here, the affirmative defense instruction regarding "reasonable bonding agents," discussed below in part III, encom-

passed the common law bonding agent's privilege.

### a. Lawful Entry with Valid Consent

Relying on the common law language in *Taylor,* Oram contends that the common law bonding agent's privilege allowed him to enter the King Street residence because Vigil consented to the entry in the bond agreement. We are not persuaded.

■ Under the common law bonding agent's privilege, a bonding agent may enter a residence to seize a principal when the residence in question is that of the principal. *Taylor,* 83 U.S. at 371. Thus, under the common law, a bonding agent has lawful authority to enter a principal's residence, even though others do not. Here, there is no dispute that Oram was acting as a bonding agent. Accordingly, he could lawfully enter Vigil's residence provided it was necessary to do so.

■ The scope of the bonding agent's privilege described above has been articulated by other courts and is consistent with the dicta in *Taylor.* The surety is authorized only to "break and enter *his* [the principal's] house." 83 U.S. at 371 (emphasis added).

Because there was a factual dispute whether the King Street address was actually Vigil's residence, the parties here disputed whether the bonding agent's privilege extends to entry of a third party's residence. However, Oram does not assert that bonding agents have an unqualified right to enter a third-party residence, and we conclude the qualification of necessity, discussed below, is dispositive in this case.

Relying on *Mease v. State,* 165 Ga.App. 746, 302 S.E.2d 429 (1983), Oram contends he was authorized to enter the King Street residence, even if it was in fact Eugene Vigil's residence. Oram further argues that *Mease* supports his entry because, there, the principal gave her mother's address on the bond application, and the court dismissed the burglary charge.

In *Mease,* the court held that the bonding agents had entered the mother's residence for a lawful purpose. 302 S.E.2d at 431.

We do not find the *Mease* court's ruling persuasive or applicable. First, there was no dispute about whether the principal lived at the residence. In addition, the court focused on the element of whether the entry was for a lawful purpose, and, thus, the court ignored the question of whether the agents could lawfully enter at all, for any purpose. Therefore, we conclude that *Mease* did not establish a rule that a bonding agent may enter the residence of a third party to seize the principal.

Here, however, we need not decide whether bonding agents may lawfully enter third-party residences. We note, nonetheless, in passing that the majority of other jurisdictions addressing it have concluded that the bonding agent's privilege does not extend to entry into a third-party residence. *See Tapia,* 468 N.W.2d at 344; *see also Mishler v. State,* 660 N.E.2d 343, 347 (Ind.Ct.App.1996); *State v. Burhans,* 277 Kan. 858, 89 P.3d 629, 636 (2004); *Herd v. State,* 125 Md.App. 77, 724 A.2d 693, 713–14 (Ct.Spec.App.1999); *Milburn v. Vinson,* 850 So.2d 1219, 1224 (Miss.Ct.App.2002); *State v. Lopez,* 105 N.M. 538, 734 P.2d 778, 783 (Ct.App.1986); *State v. Mathis,* 349 N.C. 503, 509 S.E.2d 155, 161 (1998); *but see Livingston v. Browder,* 51 Ala.App. 366, 285 So.2d 923 (Civ.App.1973); *Mease,* 165 Ga.App. 746, 302 S.E.2d 429.

Here, in contrast, whether Vigil lived at 1446 King Street was a disputed question.

Oram relied on the bond agreement and other court documents, which stated that Vigil's address was 1446 King Street. However, the occupants of the house, including Eugene Vigil, testified that Vigil did not live at the residence, and Eugene Vigil testified that his brother had used the address without permission in the past.

■ Thus, the issue of whether the King Street address was Vigil's residence was a jury question. The evidence was sufficient to enable a reasonable juror to conclude beyond a reasonable doubt that Vigil did not live there, that the bonding agent privilege did not render Oram's entry into the residence lawful, and, thus, that Oram "entered or remained unlawfully in the dwelling of another."

## b. Lawful Entry When Necessary

██ The scope of the bonding agent's privilege is further limited because a surety is authorized to break and enter only *"if necessary."* *Taylor*, 83 U.S. at 371 (emphasis added). This language is repeated in nearly identical words in Vigil's bond agreement. Further, under the common law, police officers could not break and enter to make a warrantless arrest absent necessity. *Accarino v. United States*, 179 F.2d 456, 464 (D.C.Cir.1949).

Additional cases recognize that the necessity requirement existed at common law. *See, e.g., Commonwealth v. Brickett*, 25 Mass. (8 Pick.) 138, 144–45 (1829) (if "the door should not be opened on demand at midnight, the bail may break it down, and take the principal from his bed, if that measure should be necessary"); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L.Rev. 731, 747 (1996) (citing numerous other cases).

██ Here, a reasonable juror could determine beyond a reasonable doubt that it was not necessary for Oram to break and enter the King Street residence when he did. Oram and Weinstein did not see Vigil in the dwelling at any time during their one hour of surveillance. In addition, they did not make any other efforts to locate Vigil, except calling numbers Vigil had provided that had been disconnected, before entering the King Street residence. Further, the bonding agents entered the residence on their first day of the job, even though LaDonna's had an additional ninety days before its bond would be forfeited. Thus, even if we assume there was evidence upon which the jury could find that the residence was John Vigil's, there was no evidence that John Vigil was at the residence, and, thus, no evidence upon which the jury could find that it was *necessary* for Oram to break and enter the residence *to seize him*.

Accordingly, we conclude that the above evidence sufficiently supports a conclusion beyond a reasonable doubt that Oram's entry was unnecessary. *Cf. People v. Aarness*, 150 P.3d 1271, 1274 (Colo.2006) (law enforcement officials entering residence to serve an arrest warrant must have reasonable belief that the suspect lives at the residence and is in the residence at the time of entry).

### 3. Contractual Authority

The contractual language in Vigil's bond agreement mirrors the common law bonding agent's privilege language in *Taylor v. Taintor*, quoted above. Thus, for the same reasons we concluded that Oram did not have common law authority to enter into the residence, we also conclude he lacked authority to enter the residence under the bond agreement.

Thus, the evidence is sufficient to support a finding that Oram unlawfully entered or remained in the King Street residence.

### B. Did Oram Knowingly Enter or Remain Unlawfully?

██ Oram argues that even if the evidence was sufficient to establish that he unlawfully entered the King Street residence, the evidence was insufficient to prove that he did so knowingly. We disagree.

Unlike the objective requirements to determine whether Oram's entry or remaining in the residence was unlawful, the determination of whether Oram *knowingly* entered or remained in the residence unlawfully is subjective. That is, we must determine whether there was sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that Oram knew his entry or remaining in the residence was unlawful.

██ The requisite culpable mental state for second degree burglary is knowingly. § 18-4-203(1). In Colorado, a person acts knowingly "when he is aware that his conduct is of such nature or that such circumstance exists." § 18-1-501(6), C.R.S. 2008. All offenses in which the mental culpability is knowingly are general intent crimes. *Id.* Further, the mental state of knowingly does not include a reasonable care standard. *People v. DeHerrera*, 697 P.2d 734, 741 (Colo. 1985). It does, however, "require an awareness." *Id.*

To act knowingly, Oram would have had to know that his entry into or his remaining in the residence was unlawful, or rather, that the following circumstances existed: (1) that Vigil did not live at the King Street residence or (2) that his entry or remaining in the residence was unnecessary.

Even if we were to assume that there was insufficient evidence to show that Oram knew that Vigil did not live at the King Street residence, we conclude there was sufficient evidence presented to enable a reasonable juror to conclude beyond a reasonable doubt that Oram knew his entry or remaining in the residence was unnecessary to seize Vigil. The evidence, viewed in the light most favorable to the prosecution, showed that Oram entered the King Street residence after little investigation, when Vigil was not there, and using a ruse.

First, Oram knew that he had conducted only one hour of surveillance at the residence without observing Vigil. He knew that LaDonna's had over ninety days to surrender Vigil to the authorities before having to forfeit the bond, yet Oram entered the King Street house on his first day on the job. Oram also knew that after entering the residence the occupants advised him that Vigil did not live there and was not present.

Second, the evidence supports a finding beyond a reasonable doubt that Oram knew that Vigil was not at the residence at the time of his entry.

The agents did not see anything to indicate that Vigil was at the residence. Oram knew that he had not attempted to contact Vigil, or Eugene Vigil, other than phone calls they made to disconnected phone numbers. Moreover, Oram remained in the residence after the occupants had informed him that Vigil was not there and did not live there. Thus, sufficient evidence supports a conclusion that Oram knew that Vigil was not in the residence when he entered or remained inside.

Third, there was also evidence that Oram was present when Weinstein falsely represented that he was with the Denver police and that Oram falsely represented that he was a federal agent both before and after they entered the house. G.V. and J.M. also testified that Weinstein falsely stated that the agents' purpose related to a claim or disturbance. Oram did not provide testimony justifying the use of such a ruse. Instead, he testified that the agents did not misrepresent who they were.

Eugene Vigil testified that Weinstein told him he would go to jail if he did not tell the agents where John Vigil was, and that Oram said, "Yeah, you're going to jail." He also testified that one of the agents falsely represented that he was "Detective Scott" and gave him a telephone number to call to provide information about John Vigil's location.

It was the jury's duty to resolve conflicting evidence, determine the relative weight to give the evidence, and determine the inferences to be drawn from it. We conclude that there was sufficient evidence, including the use of the ruse and the inconsistencies between Oram's statements and those of other witnesses, upon which the jury could find beyond a reasonable doubt that Oram's conduct demonstrated his awareness that entering and remaining in the residence was unlawful.

### C. Did Oram Intend to Commit a Crime in the Residence?

■ Oram next argues the evidence was insufficient to support the element of intent to commit a crime in the residence. We disagree.

■ Intent to commit a crime against another person or property while in the dwelling can be formed either before or after the unlawful entry. *People v. Larkins*, 109 P.3d 1003, 1004–05 (Colo.App.2004)(stating that in 1999, the General Assembly amended the second degree burglary statute to remove the requirement that intent to commit a crime must exist at the time of entry).

The crime of menacing occurs when

by any threat or physical action, [a person] knowingly places or attempts to place another person in fear of imminent serious bodily injury ... [b]y the use of a deadly weapon or any article used or fashioned in

a manner to cause a person to reasonably believe that the article is a deadly weapon. § 18–3–206(1)(a), C.R.S.2008.

J.M. and Z.V. testified that they believed Oram pointed a revolver at J.M. after Oram entered the house. Thus, a reasonable juror could conclude beyond a reasonable doubt based on that evidence that Oram entered or remained in the house with the intent to commit the crime of menacing.

Accordingly, the evidence is sufficient, when viewed in the light most favorable to the prosecution, to show that Oram's actions constituted the elements necessary to support a conviction of second degree burglary, including knowing unlawful entry or remaining in the residence and intent to commit a crime therein.

## III. Affirmative Defense Jury Instruction

Oram contends that the trial court improperly included factors in the affirmative defense instruction that misled the jury and improperly emphasized certain evidence. We reject Oram's contentions that the instruction improperly focused on four specific circumstances, singled out particular portions of the evidence, misled the jury into thinking that the list was exclusive, and failed to inform the jury that the listed circumstances were suggestions or that it was free to consider circumstances not listed. The trial court considered and rejected Oram's objections to the instruction on those grounds.

■■■ We review jury instructions de novo to determine whether they accurately inform the jury of the governing law. We review the trial court's decision to give a particular jury instruction for abuse of discretion. *Ochoa v. Vered,* 186 P.3d 107, 111 (Colo.App.2008). The trial court has broad discretion to formulate jury instructions as long as they are correct statements of the law. *People v. Davis,* 935 P.2d 79, 85 (Colo. App.1996).

Jury instruction 16 described the affirmative defense of the bonding agent's privilege, stating in part that if the jurors "find that Defendants acted as reasonable bonding agents," then it was the prosecution's burden to disprove all elements of the affirmative defense beyond a reasonable doubt. The entire instruction reads:

It is an affirmative defense to all the crimes charged in this case if you find that Defendants acted as reasonable bonding agents. The elements of this affirmative defense are:

1. Defendants were acting as authorized agents of a bail bondsman;

2. Defendants reasonably believed John Vigil had violated the conditions of his bond;

3. Defendants reasonably believed John Vigil was at 1446 King Street on August 2, 2004, at approximately 10:00 p.m.; and

4. Defendants acted reasonably in attempting to effect the arrest of John Vigil.

It is the prosecution's burden to prove beyond a reasonable doubt that Defendants were not acting reasonably, by proving beyond a reasonable doubt that one or more of these four elements of this defense did not exist in this case.

In deciding whether Defendants acted reasonably in attempting to arrest John Vigil, you must consider all the circumstances surrounding the attempted arrest. These circumstances may include:

a. All the information Defendants had about the whereabouts of John Vigil prior to the attempted arrest.

b. Whether Defendants actually observed John Vigil, or anyone they reasonably believed to be John Vigil, in the residence before they entered it.

c. Whether, and when, Defendants identified themselves as bounty hunters and gave the reason for their presence at the residence.

d. Defendants' conduct during the attempted arrest.

You may give any or all of these factors the weight you decide is appropriate in determining whether Defendants acted reasonably.

■■■ We reject Oram's contention that the four circumstances of reasonableness noted above in the jury instruction improperly

prevented the jury from considering other relevant facts.

The instruction explicitly stated that the jurors "must consider all the circumstances surrounding the attempted arrest." Further, the statement preceding the examples specifically allowed for consideration of other factors. Thus, the wording, "[t]hese circumstances may include," did not instruct or mislead the jury to consider only the four listed factors. *See Woldt v. People*, 64 P.3d 256, 269 (Colo.2003) (explaining that the plain meaning of the word "may" usually indicates discretion).

Additionally, the trial court instructed the jury to consider all the evidence that was presented in reaching its verdict as to the elements of the offenses and the affirmative defenses. Therefore, the trial court's formulation of the jury instruction for the affirmative defense related to bonding agents was not improper.

To the extent Oram argues that the jury might have misunderstood the instruction to exclude consideration of other factors, we must presume that the jurors understood and followed the court's instructions. *See People v. Moody*, 676 P.2d 691, 697 (Colo. 1984).

In addition, we note that Oram utilized this affirmative defense instruction given by the court in his closing, arguing that it was an affirmative defense if the jury found that Oram reasonably believed Vigil *was at* the residence and acted reasonably in attempting to effect his arrest. He also argued that John Vigil had listed the residence as his address, the prosecution had failed to prove that John Vigil did not live there, and Oram reasonably believed he did live there. In addition, Weinstein's attorney referred the jury to a portion of the first provision in the bond application and agreement and argued that the bond agents could "if necessary, break entrance into [Vigil's] residence [to arrest him]."

Thus, the affirmative defense was fully presented through Oram's own testimony and closing argument.

## IV. Oram's Tendered Jury Instructions

Oram contends that the trial court erred in rejecting his three tendered jury instructions relating to the affirmative defense of consent because they were all correct statements of law and were crucial to his defense. Once again, we disagree.

We review the trial court's decision to give supplemental guidance to the jury for abuse of discretion. *Auman v. People*, 109 P.3d 647, 662 (Colo.2005). The trial court need not give a supplemental instruction if it is already encompassed in another instruction. *See People v. Tweedy*, 126 P.3d 303, 307–08 (Colo.App.2005) (trial court can refuse to give an instruction that contains an incorrect statement of law or that states principles already encompassed elsewhere in the court's instructions). Moreover, the trial court is not required to give an instruction defining an affirmative defense where proof of the elements of the offense necessarily requires disproof of elements of the affirmative defense. *Dunton v. People*, 898 P.2d 571, 573 (Colo.1995). Oram requested three supplemental jury instructions. The first stated that consent was an affirmative defense to the second degree burglary charge because it would negate an element of the offense. The second described his authority as a bail bonding agent, quoting the language from *Taylor*. The third described an affirmative defense to the second degree burglary charge and stated he should be immune from criminal liability because of the bail bonding agent's privilege.

As to the first, we conclude that Oram was not entitled to the instruction because he did not introduce evidence that John Vigil consented to the bond agents' entry when it was not necessary to enter to seize him.

Defendants introduced Defendant's Exhibit B, "Defendant Application and Agreement for Surety Bail Bond." John Vigil's signature appears on the first and third pages of Exhibit B, and his handwritten initials appear next to numbered provisions. Through this document, testimony, and argument, defendants drew the jury's attention to the first provision of the agreement in which John

Vigil agreed that "if necessary [the surety] may break and enter his/her house of residence [to seize him and deliver him to government authorities]." Thus, this provision purports only to grant the surety the right to enter *John Vigil's house of residence.* Moreover, it grants consent to such entry only *if necessary to seize him.*

We also concluded above that there was sufficient evidence for the jury to determine Oram did not have consent based upon the prosecution's proving beyond a reasonable doubt that he committed all the elements of burglary, including unlawful entry. Proof of unlawful entry requires proof of lack of consent. *Cf., e.g., Dunton,* 898 P.2d at 573 (proof of victims' nonconsent is implicit within the elements of first degree sexual assault by force or violence).

■ As to the second, the tendered instruction was an exact quote from the bonding agent's privilege language in *Taylor.* However, the jury was given Oram's affirmative defense instruction discussed in part III which, as noted above, encompassed the common law bonding agent's privilege. Thus, the trial court did not abuse its discretion in declining to give this instruction.

■ As to the third, the tendered immunity instruction was an improper statement of the law. A surety can face criminal liability. *See Lopez,* 734 P.2d at 783; *State v. Portnoy,* 43 Wash.App. 455, 718 P.2d 805, 811 (1986). We also reject this contention because Oram provides no statutory or case support and no analysis for the proposition that a citizen may grant another citizen transactional immunity from prosecution.

Thus, the trial court did not err in refusing to give Oram's proposed jury instructions regarding consent, the bonding agent privilege, and immunity.

### V. Response to Jury Question

■ Oram contends that the trial court improperly responded to a jury question during deliberations regarding the meaning of the bond agreement. Again, we disagree.

■ Whether to provide a jury with additional information to clarify a jury instruction is a matter of trial court discretion, and we review for abuse of discretion. *People v. Serpa,* 992 P.2d 682, 685 (Colo.App. 1999). Nonetheless, if a jury indicates that it does not understand a matter of law, the court should clarify the matter. *Leonardo v. People,* 728 P.2d 1252, 1256 (Colo.1986). However, the court should not respond if (1) the jurors can be adequately informed by directing their attention to a portion of the original instructions, (2) the request concerns matters not in evidence, or does not pertain to the law of the case, and (3) the request would call upon the court to express an opinion upon factual matters that the jury should determine. *Id.* at 1255.

■ We must also be careful not to inquire into or speculate about jury deliberations; instead, we must assume that the jury followed the instructions given. *People v. Gookins,* 111 P.3d 525, 529 (Colo.App.2004).

The jury asked the court during deliberations, "[D]oes [the bond agreement] legally give the bonding company or its agents the right to enter into the residence at 1446 King Street?" This question asked for a conclusion of law that could not be made without first finding facts related to who gave consent, the scope of the consent, and whether the conditions of consent were present. As we have noted, the bond agreement gave the bond agents a right to enter John Vigil's residence. The agreement plainly reflects John Vigil's consent for the bond agents to break and enter *his* house *if it was necessary to do so to seize him.*

Thus, it is beyond dispute that the agreement did not give the bond agents the *unconditional* right to enter into the King Street residence.

The court responded, "[T]he bonding documents did not necessarily give the defendant[s] the right to enter the residence at 1446 King Street, but you may consider those documents in deciding whether the defendants acted reasonably within the meaning of the affirmative defense [instruction]."

The trial court's response included the phrase "not necessarily," which Oram argues intruded on the jury's fact-finding duty because it was not a neutral answer and less-

ened the People's burden to disprove the affirmative defense beyond a reasonable doubt. The jury's request did not call for the court to express an opinion upon factual matters; rather, it asked for a legal determination whether the bond agreement gave Oram the right to enter the residence. However, the legal effect of the agreement was dependent on the facts, and thus, the trial court's response was legally correct and properly referred the jury to the bonding documents.

Moreover, the trial court did not respond that the agents were either authorized or unauthorized by law to enter the residence based on the bond agreement. Thus, the trial court's response did not concern matters not in evidence. Instead, the court left the matter for the jury to decide. We assume the jury followed the instructions given.

Oram argues that the phrase "not necessarily" intruded on the jury's fact-finding duty because it was not a neutral answer and lessened the People's burden to disprove the affirmative defense beyond a reasonable doubt. We conclude that the phrase was neutral and did not lessen the People's burden.

Thus, the trial court did not abuse its discretion in responding to the jury question.

The judgment is affirmed.

Judge CARPARELLI concurs.

Judge CONNELLY concurs in part and dissents in part.

Judge CONNELLY concurring in part and dissenting in part.

The leading case entitling defendants to judicial review of the sufficiency of evidence used an apt example: "Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." *Jackson v. Virginia,* 443 U.S. 307, 323–24, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The "constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless." *Id.* at 323, 99 S.Ct. 2781.

Whatever else may be said of these two bounty-hunting defendants, they were not proven burglars. I would uphold their felony menacing convictions but reverse their burglary convictions.

A. The Atypical Colorado Burglary Statute Requires Proof Defendants Subjectively Knew Entry Was Unlawful.

The trial court, without objection, instructed the jury that burglary required proof that defendants "knowingly unlawfully entered or remained unlawfully" in another's residence. This adverbial juxtaposition is highly atypical. Only for the rarest of crimes must defendants have known their actions were unlawful. *See Cheek v. United States,* 498 U.S. 192, 199–200, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); *People v. Holmes,* 959 P.2d 406, 414 (Colo.1998).

The requirement of proof defendants *knew* the *unlawfulness* of their entry is rooted in Colorado burglary statutes. § 18–4–203(1), C.R.S.2008 (second degree burglary statute applying where defendant "knowingly breaks an entrance into [not charged here], enters unlawfully in, or remains unlawfully" in a building with intent to commit a crime therein); *see also* § 18–4–202(1), C.R.S.2008 (similar first degree burglary statute with additional elements). The People concede "knowingly" extends to "enters unlawfully" and modifies both words, requiring proof defendants knew their entry was unlawful.

Review of other jurisdictions' burglary statutes confirms this Colorado requirement is atypical. The Model Penal Code (MPC) contains *no* scienter requirement as to the entry: it defines burglary to occur where one "enters a building or occupied structure ... with purpose to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." MPC § 221.1(1). Thus, under the MPC, as long as a defendant's purpose was to commit a crime inside, it is irrelevant whether a defendant *believed* the entry was authorized.

Most burglary statutes, like the MPC, make irrelevant a defendant's belief that entry was authorized. Thirty-four states and the District of Columbia impose no scienter element regarding entry. *See* Statutory Ap-

pendix part A to this opinion. Two other state statutes imposing a scienter requirement clearly suggest a defendant need not have known entry was illegal. *See* Appendix part B. In most remaining states it cannot readily be determined from the statutes whether such knowledge is required. *See* Statutory Appendix parts C & D. Only two other state statutes clearly suggest the prosecution must prove a burglary defendant knew the entry was illegal. *See* Statutory Appendix part E.

Prior Colorado burglary statutes, like most other states' statutes, did not require proof of knowingly unlawful entry. *See* Ch. 121, sec. 1, § 40–4–203(1), 1971 Colo. Sess. Laws 427 (formerly covering one who "knowingly breaks an entrance into, or *enters,* or remains unlawfully in a building" with intent to commit crime therein) (emphasis added). In 1999, however, a divided supreme court held the former statute "require[d] proof that the defendant intended to commit a crime inside at the moment he first became a trespasser." *Cooper v. People,* 973 P.2d 1234, 1240 (Colo. 1999). The Colorado legislature promptly amended the statute to cover unlawful entries in which the intent to commit another crime was formed later, but for the first time added "unlawfully" after "enters." Thus, contrary to the model instruction under the former statute, it is no longer sufficient that a defendant "knowingly entered" the building, CJI–Crim. 14:03 (1983); rather, to be guilty of burglary, a defendant must have "knowingly entered unlawfully."

This atypical requirement usually is not significant, as defendants entering others' premises to commit crimes often will know they had no lawful right to enter. But where "the Government must prove that the defendant acted with knowledge that his conduct was unlawful," *Ratzlaf v. United States,* 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), a defendant who "truly believed" he was acting lawfully is not guilty "however unreasonable a court might deem such a belief." *Cheek,* 498 U.S. at 202, 111 S.Ct. 604. The "knowingly" requirement is not satisfied in Colorado just because a defendant reasonably should have known some fact or circumstance. *See People v. DeHerr-*

*era,* 697 P.2d 734, 740–41 (Colo.1985) (discussing § 18–1–501(5), C.R.S.2008); *People v. Bornman,* 953 P.2d 952, 954 (Colo.App. 1997), *followed in Auman v. People,* 109 P.3d 647, 665 (Colo.2005).

### B. The Trial Evidence Failed to Show Defendants Knew Their Entry Was Illegal.

We accordingly must decide whether a jury properly could have found defendants subjectively knew their entry violated Colorado law. The "task is to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt." *People v. Dunlap,* 124 P.3d 780, 819 (Colo.App.2004) (citing *Jackson v. Virginia,* and Colorado cases).

#### 1. The Legal Problems

The main problem with finding defendants knowingly exceeded the legal limits on their bonding agent privilege is that those limits have not previously been established in Colorado. While the majority holds today a common law privilege exists in this State, it relies on a "necessity" requirement to limit when bonding agents are privileged to enter a home to effectuate recapture. But these defendants could not subjectively have known they were exceeding previously-unannounced limits on a common law privilege.

The majority discerns these limits from Supreme Court language that "if necessary, [bonding agents] may break and enter [an accused's] house" to "seize him and deliver him up in their discharge." *Taylor v. Taintor,* 16 Wall. 366, 83 U.S. 366, 371, 21 L.Ed. 287 (1872). *Taylor* did not elucidate the "if necessary" language, which may require no more than reasonableness. As Chief Justice Marshall wrote about the "necessary and proper" clause, U.S. Const. art. I, § 8, cl. 18:

Does [the word "necessary"] always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the com-

mon affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable.

*McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 413–14, 4 L.Ed. 579 (1819) (upholding congressional authority to establish a national bank). Other cases likewise recognize that the "word 'necessary'" does not always "refer to absolute necessity." *Stenberg v. Carhart,* 530 U.S. 914, 937, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *see, e.g., Price v. Johnston,* 334 U.S. 266, 279, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); *Read v. Read,* 119 Colo. 278, 285, 202 P.2d 953, 957 (1949).

Later cases have construed "the 'if necessary' qualification in *Taylor*" to require that bonding agents use "reasonable means." *Lopez v. McCotter,* 875 F.2d 273, 277 (10th Cir.1989). A reasonableness requirement is appropriate in a civil context but it muddies the issues under a criminal statute requiring proof of a knowingly unlawful entry. Indeed, in civil lawsuits against government agents for unreasonable searches or seizures, courts grant qualified immunity absent violation of "a clearly established Fourth Amendment protection." *Saucier v. Katz,* 533 U.S. 194, 207, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Not even that civil qualified immunity standard could be overcome here because the limits announced in the majority opinion were not clearly established—they did not even exist—in Colorado before today.

This area would benefit from legislative guidance. Absent such guidance, limits on bounty hunter rights to enter homes must be determined through common law adjudication. But due process confines courts applying common law rules retroactively and unforeseeably to criminal defendants. *See generally Rogers v. Tennessee,* 532 U.S. 451, 456–67, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001) (discussing *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)).

The Tenth Circuit's *Lopez* decision, which overturned a bail bondsman's state conviction for attempted burglary, is illustrative. There, a New Mexico appeals court for the first time construed the Uniform Criminal Extradition Act (UCEA) to eliminate bondsmen's rights to recapture out-of-state fugitives without invoking extradition processes. The Tenth Circuit held this new construction could be applied prospectively—"henceforth, a foreign bondsman must comply with the UCEA in seeking the rearrest of his principal" in New Mexico—but not "retroactively" in a criminal prosecution. 875 F.2d at 275–78 (citing *Bouie* and other due process cases). It concluded the bondsman lacked "fair warning that his conduct would be regarded as criminal." *Id.* at 277–78.

*Lopez* highlights the constitutional problems where one judicial decision both articulates and then applies retroactively to a criminal defendant limits on the "very broad" common law privileges of bail bondsmen. *Id.* at 276–77. Here, we need not reach the constitutional issues because the Colorado burglary statute required proof defendants knew their entry was illegal. That proof cannot be supplied by violations of legal standards announced for the first time today.

### 2. The Factual Problems

The burglary convictions could not stand even if the privilege limits announced by the majority could be applied to these defendants. The majority recognizes defendants were privileged, under both common law and the bail contract, to enter an apparent bail-jumper's home to effectuate recapture. And it assumes defendants believed this home was that of suspected bail-jumper John Vigil. How, then, could defendants have known their entry of the Vigil residence was unlawful? The majority concludes they could have known it was illegal because it was "unnecessary."

The majority cites three bases on which defendants properly could be found to have known the entry was unnecessary and therefore illegal. In my view, these bases ultimately involve the unreasonableness of defendants' entry. Because criminal burglary convictions require proof defendants subjec-

tively knew their entry was illegal, proving an unreasonable entry cannot suffice.

The first basis involves the alleged prematurity of the entry: defendants entered the home their "first day on the job," after "conducting only one hour of surveillance," when their company still had ninety days to recapture Vigil without forfeiting bail. But there is nothing in the common law privilege or bail contract requiring bonding agents to wait for a prescribed period before entering a bail-jumper's home for recapture. Under *Taylor*, one bailed from jail "is regarded as delivered to the custody of his sureties," whose "dominion is a continuance of the original imprisonment." 83 U.S. at 371. At most, whether defendants acted precipitously affects the objective reasonableness of their actions, but not whether they subjectively knew they could not enter the home to reassert "dominion" over a suspected bail-jumper.

Second, the majority concludes the evidence sufficiently proved defendants knew Vigil was not then in the home: it faults defendants for not "conducting extensive surveillance," for not having "seen Vigil inside," and for inadequate efforts to phone him and his brother. This again goes to reasonableness—perhaps defendants should have done more to ensure Vigil was there—but fails to prove they knew he was not there. The majority also faults defendants for remaining inside after occupants said Vigil did not live there. But this has nothing to do with the initial entry, and defendants were not required immediately to accept Vigil's relatives' claims that contradicted Vigil's own bail papers.

Finally, the majority relies on defendants' using a "ruse" of claiming to be law enforcement officers to gain entry. We need not condone this deception to conclude it does not prove defendants knew they had no legal right to enter the home. Ruse or not, the legality of entry turned on the scope of a common law privilege. Because the limits on that privilege (particularly those involving necessity) were unsettled at the time of the entry, defendants could not have been proven beyond a reasonable doubt to have known they were exceeding those limits.

Defendants had no privilege to menace third parties, and so I would uphold their felony menacing convictions. And they may be subject to civil liability to the extent their entry of the home and interactions with its occupants were unreasonable. But the evidence was legally insufficient to prove defendants committed burglary, as defined in Colorado, by *knowing* they *unlawfully* entered or remained in the home. To paraphrase the Supreme Court, "even a [felony menace] is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." *Jackson v. Virginia*, 443 U.S. at 323–24, 99 S.Ct. 2781.

## STATUTORY APPENDIX STATE BURGLARY STATUTES

### A. NO SCIENTER ELEMENT AS TO ENTRY

Alaska Stat. § 11.46.310(a) ("enters or remains unlawfully")

Ariz.Rev.Stat. § 13–1507(A) ("entering or remaining unlawfully")

Ark.Code § 5–39–201(a)(1) ("enters or remains unlawfully")

Cal.Penal Code § 459 ("enters")

Conn. Gen.Stat. § 53a–102(a) ("enters or remains unlawfully")

D.C.Code § 22–801(a) ("break and enter, or enter without breaking")

Fla. Stat. § 810.02(1)(b)(1) ("[e]ntering" unless premises were open or defendant was licensed or privileged)

Ga.Code § 16–7–1(a) ("without authority . . . enters or remains")

Idaho Code § 18–1401 ("enters")

Ind.Code § 35–43–2–1 ("breaks and enters")

Iowa Code § 713.1 ("having no right, license or privilege to do so, enters")

La.Rev.Stat. § 14:62(A) ("unauthorized entering")

Md.Code, Crim. Law § 6–202(a) ("break and enter")

Mass. Gen. Laws ch. 266, § 14 ("breaks and enters")

Mich. Comp. Laws § 750.110(1) ("breaks and enters")

Minn.Stat. § 609.582(1) ("enters a building without consent")

Miss.Code § 97–17–23(1) ("breaking and entering")

Nev.Rev.Stat. § 205.060(1) ("enters")

N.H.Rev.Stat. § 635:1(1) ("enters" unless premises were open or defendant was licensed or privileged)

N.J. Stat. § 2C:18–2(a)(1) ("[e]nters" unless structure was open or defendant was licensed or privileged)

N.M. Stat. § 30–16–3 ("unauthorized entry")

N.C. Gen.Stat. § 14–54(a) ("breaks or enters")

Okla. Stat. tit. 21, § 1435 ("breaks and enters")

Or.Rev.Stat. § 164.215(1) ("enters")

18 Pa. Cons.Stat. § 3502(a) ("enters" unless premises were open or defendant was licensed or privileged)

R.I. Gen. Laws § 11–8–2(a) ("break and enter" without consent)

S.C. Code § 16–11–312(A) ("enters a dwelling without consent")

S.D. Codified Laws § 22–32–3 ("enters or remains" unless premises were open or defendant was licensed or privileged)

Tenn. Code § 39–14–402(a)(1) ("[e]nters" building not open to public without effective consent of owner)

Tex. Penal Code § 30.02(a)(1) ("enters" building not open to public)

Utah Code § 76–6–202(1) ("enters or remains unlawfully")

Va. Code § 18.2–89 ("break and enter")

Wash. Rev. Code § 9A.52.030(1) ("enters or remains unlawfully")

W. Va.Code § 61–3–11(a) ("break and enter")

Wyo. Stat. § 6–3–301(a) ("without authority, he enters or remains")

B. SCIENTER REQUIREMENT DOES NOT APPLY TO UNLAWFULNESS OF ENTRY

720 Ill. Comp. Stat. 5/19–1(a) ("without authority he knowingly enters or without authority remains")

Kan. Stat. § 21–3715 ("knowingly and without authority entering into or remaining within")

C. UNCLEAR WHETHER SCIENTER REQUIREMENT APPLIES TO UNLAWFULNESS OF ENTRY OR ONLY TO REMAINING UNLAWFULLY

Ala. Code § 13A–7–6(a) ("knowingly enters or remains unlawfully")

Del. Code tit. 11, § 825(a) ("knowingly enters or remains unlawfully")

Haw. Rev. Stat. § 708–811(1) ("intentionally enters or remains unlawfully")

Ky. Rev. Stat. § 511.030(1) ("knowingly enters or remains unlawfully")

Me. Rev. Stat. tit. 17–A, § 401(1)(A) ("enters or surreptitiously remains in a structure knowing that that person is not licensed or privileged to do so")

Mont. Code § 45–6–204(1) ("knowingly enters or remains unlawfully")

N.Y. Penal Law § 140.25 ("knowingly enters or remains unlawfully")

D. OTHER UNCLEAR SCIENTER REQUIREMENTS

Neb. Rev. Stat. § 28–507(1) ("willfully, maliciously, and forcibly breaks and enters")

N.D. Cent. Code § 12.1–22–02(1) ("willfully enters or surreptitiously remains ... when at the time the premises are not open to the public and the actor is not licensed, invited, or otherwise privileged to enter or remain as the case may be")

Ohio Rev. Code § 2911.12(A) ("[t]respass"); *see* Ohio Rev. Code § 2911.21(A)(1)

(defining "trespass" to include "[k]nowingly enter[ing] or remain[ing]")

Wis. Stat. § 943.10(1m) ("intentionally enters . . . without the consent" of lawful possessor)

## E. PLAINLY REQUIRES KNOWLEDGE OF ENTRY'S UNLAWFULNESS

Mo. Rev. Stat. § 569.170(1) ("knowingly enters unlawfully or knowingly remains unlawfully")

Vt. Stat. tit. 13, § 1201(a) ("enters any building or structure knowing that he is not licensed or privileged to do so")